UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Michael Anthony Tomars, by his
conservator Jacqueline Mannering,

      Plaintiff,

v.                                                           No. 12-cv-2162 (JNE/HB)
                                                             ORDER
United Financial Casualty Company,
The Progressive Corporation, and
Progressive Casualty Insurance Company,

      Defendants.

---

This is an action for underinsured motorist ("UIM") benefits brought by Plaintiff Michael

Anthony Tomars.  The case is before the Court on two motions for summary judgment – one by

Defendant United Financial Casualty Company, and the other brought jointly by Defendants The

Progressive Corporation and Progressive Casualty Insurance Company (collectively, "the

Progressive Defendants").

For the reasons discussed below, United and The Progressive Corporation are dismissed

from this action.  Progressive Casualty is responsible for providing Tomars with the minimum

levels of UIM coverage required by Minnesota's No-Fault Act.  The precise amount of Tomars'

recovery remains to be determined.

## **Background**

United is an insurance company that writes commercial lines, and Progressive Casualty is

an insurance company that writes personal lines automobile coverage.  Both are wholly-owned

1

subsidiaries of The Progressive Corporation.  All three are Ohio corporations with their principle place of business in the Cleveland area.

Tomars was a claims investigator for Progressive Casualty, working out of its Roseville, Minnesota office.  Progressive Casualty assigned Tomars a 2007 Ford 500, which was registered and licensed in Minnesota and garaged at the Progressive claims office in Roseville, to use in the course of his work.  That car was part of a fleet of several thousand vehicles garaged across the United States that Progressive Casualty leased for the use of its employees.  This nationwide fleet, with the exception of less than 100 vehicles that were garaged in Michigan, was insured by a single policy that was issued by United and which identified "THE PROGRESSIVE CORP ETAL" (sic) as the named insured.

In January of 2010, while driving the Ford 500, Tomars was injured in a collision with a truck on a snowy stretch of highway in Minnesota.  The record here does not detail the injuries Tomars suffered, but it is undisputed that his total damages exceed $1 million.

The truck with which Tomars collided was insured to a $1 million limit of liability for bodily injury.  Tomars sued the driver and the owner of the truck in Minnesota state court.  That case settled in 2012.  By the terms of the settlement, Tomars received just under $1.3 million, which consisted of a lump sum payment from the insurer of the truck that exhausted its $1 million liability limit as well as $300,000 in payments directly from the driver and the owner.

Tomars subsequently filed this action, alleging in a single-count Complaint that the policy that insured the Ford 500 at the time of the accident provides up to $1 million in UIM coverage and that United had breached the terms of that policy by denying his application for those benefits.  United twice moved for summary judgment on that breach of contract claim. The briefing on those motions revealed a dispute between Tomars and United regarding the

2

contents of the operative insurance policy and the nature of the UIM coverage it affords.  Both of the motions were denied without prejudice.

Tomars subsequently amended his Complaint to add a second count, asserting that, if he is not entitled to $1 million of UIM coverage under the United policy, then "that same coverage becomes available through" The Progressive Corporation and Progressive Casualty.[1]

The two pending motions for summary judgment – from United on Count I and from the Progressive Defendants on Count II – have now followed.

## Discussion

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  *Gazal v. Boehringer Ingelheim Pharm., Inc.*, 647 F.3d 833, 837-38 (8th Cir. 2011)

---

[1]     The cause of action or theory of liability that Tomars endeavors to press against the Progressive Defendants is not at all clear.  In his Amended Complaint, under the heading of Count II, Tomars asserts that the Progressive Defendants should be made to provide him with $1 million of UIM benefits because Minnesota's No-Fault Act required them to insure the Ford 500 with "add-on Underinsured Motorist coverage" and they in fact "intended and agreed to provide add-on Underinsured Motorist Coverage with limits of" $1 million.

However, on the motions before the Court, Tomars argues that the No-Fault Act and the intentions of the Progressive Defendants with respect to the fleet policy require that that contract be interpreted in such a way that United would be liable to him for $1 million of UIM benefits. *See* Plaintiff's Memorandum in Opposition at 16, 21, ECF No. 93 ("[United] contracted with the Progressive [Defendants] to provide one million dollars of underinsured motorist coverage for all corporate fleet vehicles on a nationwide basis, and must be compelled to honor its contract. . . . Minnesota law requires add-on underinsured motorist coverage, and [United], as a licensed insurer, must provide state-compliant coverage.").

The discussions of contract reformation on equitable and statutory grounds that appear in Sections II and III below represent the Court's efforts to place Tomars' nebulous claims and supporting arguments within their appropriate legal frameworks.

3

(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252 (1986)).  "In determining whether there is any genuine factual dispute, the court must look at the record and any inferences drawn therefrom in the light most favorable to the . . . non-moving party."  *Grider v. Bowling*, --- F.3d ----, No. 14-2869, 2015 WL 2168302, *2 (8th Cir. May 11, 2015) (citing *Anderson*, 477 U.S. at 255).

As an initial matter, The Progressive Corporation contends that it should be dismissed from this action because, while it appears as the named insured on the policy that covered Progressive Casualty's fleet, it is neither the owner nor the insurer of those vehicles.  Consequently, The Progressive Corporation argues, there is no basis on which it could be liable to Tomars for the payment of UIM benefits.

At oral argument, Tomars and the Progressive Defendants agreed, based on a review of the lease agreement, that Progressive Casualty was the long-term lessee of the Ford 500 and therefore that vehicle's "owner" within the meaning of Minnesota's No-Fault Act.  *See* Minn. Stat. § 65B.43, subd. 4 (defining the lessee of a motor vehicle that is "the subject of a lease having an initial term of six months or longer" as its "owner").  As a result, Tomars did not object to the dismissal of The Progressive Corporation as a defendant.  Therefore, in that respect, the Progressive Defendants' motion is granted.

Two Defendants – United and Progressive Casualty – thus remain.  On its motion for summary judgment, United argues that the claim for UIM benefits that Tomars asserts against it fails in the face of the plain terms of the fleet policy that insured the Ford 500 at the time of the accident and, while Tomars urges that those terms be reformed, there is no basis for doing so here.  For its part, Progressive Casualty argues that, if no UIM benefits are available to Tomars under the fleet policy, then it may only be liable to Tomars by implication of law for the

minimum level of UIM coverage that an owner is required to maintain on a Minnesota vehicle under Minnesota's No-Fault Act.

As explained below, on this record, the Court agrees with the Defendants.

## I.    Policy.

The place to begin is with the policy.  It is undisputed that Progressive Casualty leased the Ford 500 on a long-term basis, registered it in Minnesota, garaged it at its claims office in Roseville, assigned it to Tomars for his use in the scope of his employment, and insured it under a commercial automobile policy that was issued by United in Ohio and which covered Progressive Casualty's entire nationwide fleet, with the exception of less than 100 vehicles located in Michigan.

Ascertaining the precise contents of this policy, though, has been the source of some consternation throughout the course of this litigation.  Underlying much of the confusion has been that

> [t]he insurance industry customarily uses standardized forms [that] are generically written to provide for the insurance needs of a wide range of policyholders. Combinations of the various standardized forms are used to create a customized policy for each policyholder.  This is accomplished by using base forms such as Commercial Auto, Personal Auto, Personal Umbrella, or Commercial General Liability, which are supplemented by state-specific endorsements that expand or limit the extent of insurance coverage in accordance with the desire of the parties and with each state's laws.

*Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1262 (Ohio 2003).

Thus, where a commercial auto policy covers a fleet of vehicles that are registered and garaged across the country, it would perhaps be expected that that policy would include a series of state-specific endorsements conforming its coverages to the requirements imposed by the insurance laws of the states in which particular vehicles are located.  *E.g., Murphy v. Milbank*

*Mut. Ins. Co.*, 388 N.W.2d 732, 734 (Minn. 1986) (analyzing a "policy cover[ing] a commercial fleet of over 2,000 vehicles operated nationwide [that] provided for uninsured motorist coverage conforming to the state where a particular vehicle was registered").  With this approach, a single commercial fleet policy can, in effect, be broken down into constituent state-specific policies, each applicable to the portion of the fleet located within that particular state.  *Cf.* Restatement (Second) of Conflict of Laws § 193, cmt. f (1973) (noting that "multiple risk policies which insure against risks located in several states . . . usually incorporate the special statutory forms of the several states involved [and, p]resumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved [multiple] policies, each insuring an individual risk").

Earlier in this litigation, there was evidence – emanating from United itself – that this was in fact how the commercial auto policy insuring Progressive Casualty's nationwide fleet was constructed.  In the spring of 2011, Tomars requested a certified copy of the policy that insured the Ford 500 at the time of his accident in January of 2010.  In response, United provided Tomars with a set of policy documents that it certified to be "a true and complete copy of the original" fleet policy applicable to the Ford 500.  *See* Letter of April 20, 2011 and Enclosures, ECF No. 39-1 at 3-56 (letter on "Progressive" letterhead from Jason Ball to Tomars' counsel enclosing "[c]opy of applicable insurance policy" with "[d]eclarations sheet" and "[e]ndorsements" that were certified to be "a true and complete copy of the original"); United's Memorandum in Support of First Motion for Summary Judgment at 7, ECF No. 36 (identifying Jason Ball as a "United Financial representative[] involved in the issuance of the policy and the certification of the policy").  This certified policy consists of:

- an "Ohio Commercial Auto Policy" jacket (Form 1781 OH (01/09));

- a declarations page – with the premiums evidently redacted and the space for listing the "attachments to policy at issuance" blank – indicating that the policy provides a $1 million limit of liability for bodily injury, property damage, collision, comprehensive, and "uninsured motorists" coverages;

- a Commercial Auto base form (Form 6912 (09/05)); and

- a number of endorsements, including a Minnesota Amendatory Endorsement (Form 4881 MN (07/07)) and a Minnesota Uninsured/Underinsured Motorist ("UI/UIM") Coverage Endorsement (Form 2852 MN (09/05)).

Enclosures to Letter of April 20, 2011, ECF No. 39-1 at 3-56.

The importance that attaches to determining which state-specific UI/UIM endorsement covered the Ford 500 at the time of Tomars' accident lies in the fact that "[t]here are four general types of UIM coverage systems – difference of limits, damages less limits, limits less paid, and damages less paid . . . ." *Dohney v. Allstate Ins. Co.*, 632 N.W.2d 598, 600 (Minn. 2001). Since 1989, Minnesota's No-Fault Act has defined UIM as "damages less paid" coverage, meaning that it provides "for the protection of persons insured under that coverage who are legally entitled to recover damages for bodily injury from owners or operators" of "a motor vehicle or motorcycle to which a bodily injury liability policy applies at the time of the accident but its limit for bodily injury liability is less than the amount needed to compensate the insured for actual damages." Minn. Stat. §§ 65B. 43, subd. 17, 19. In other words, in Minnesota, payment for an insured's bodily injury damages under the UIM provision in an auto policy "begins where payment from the tortfeasor leaves off." *Dohney*, 632 N.W.2d at 602-603.

The Minnesota UI/UIM endorsement included in the policy that United certified and provided to Tomars in the spring of 2011 provides this species of UIM coverage. *See* Minnesota UI/UIM Endorsement at 12-13, 15, ECF No. 39-1 (obligating insurer to "pay for damages" – less "all sums paid . . . by or on behalf of any persons or organizations that may be legally responsible" for the damages – "which an insured is entitled to recover from the owner or

7

operator of an underinsured auto because of bodily injury," where "underinsured auto" is defined as "an auto or trailer of any type to which a bodily injury liability bond applies at the time of the accident, but its limit of liability for bodily injury is less than the damages, which an insured is entitled to recover from the owner or operator of that auto because of bodily injury").  And Tomars, as an occupant of the Ford 500, is an insured under that endorsement.  *Id.* at 12-13 (defining "insured" as "any person occupying your insured auto").  Because it is undisputed that the damages for the bodily injury that Tomars sustained in the accident exceed the $1 million limit of liability for bodily injury in the policy covering the truck with which he collided, Tomars would be entitled to payment from United for his unrecovered damages, to a cap of $1 million, under this certified policy.

With that policy in hand, Tomars filed suit against the driver and owner of the truck in Minnesota state court in the summer of 2011, while notifying United, through Ball, of the commencement of the action.  That case proceeded over the next year before settling in the summer of 2012; Tomars notified United of that development as well.

Shortly thereafter, in August of 2012, Tomars filed suit against United in Hennepin County District Court, claiming that it had breached the policy covering the Ford 500 by refusing his demand for payment of up to $1 million in UIM benefits.  *See Washington v. Milbank Ins. Co.*, 562 N.W.2d 801, 805 (Minn. 1997) (explaining that "a UIM claimant may . . . settle the tort action for 'the best settlement,' give notice to the underinsurer, and then maintain a claim for UIM benefits") (citing *Schmidt v. Clothier*, 338 N.W.2d 256, 261 (Minn. 1983)).  United removed the case to this Court.

The following summer, United moved for summary judgment, asserting that it had provided the certified policy containing the Minnesota UI/UIM endorsement to Tomars in error

and – despite the fact that Progressive Casualty's vehicles were registered and garaged in 47 different states – that the fleet policy insuring all of them contained only Ohio endorsements. United contended that the true fleet policy applicable to the Ford 500 at the time of the accident consists of:

- the "Ohio Commercial Auto Policy" jacket (Form 1781 OH (01/09));

- a declarations page – similar to the declarations page that United had certified and provided to Tomars' counsel in 2011, though without the redactions to the premiums and with the space for listing the "attachments to policy at issuance" filled in with the numbers for eight forms – which indicates that the policy provides a $1 million limit of liability for bodily injury, property damage, collision, comprehensive, and "uninsured motorists" coverages;

- a second declarations page, which on its face indicates that it covers only five specifically-listed vehicles garaged in Cleveland, Ohio – none of which are the Ford 500[2];

- a different edition of the Commercial Auto base form (Form 6912 (03/05)); and

---

[2]     It bears emphasizing that this second, two-page declarations page contains an "Auto coverage schedule" that lists only five vehicles garaged in Ohio.  *See* Renewal Declarations Page, ECF No. 37-1 at 5.  The Ford 500 – which, it is undisputed, was registered and garaged in Minnesota – is not among the five vehicles listed in this "Auto coverage schedule."  In addition, this second declarations page shows a premium of $5,072 for insuring those five listed vehicles. *Id.* at 4.

        In contrast, the first declarations page incorporates by reference a "vehicle schedule on file with company."  The parties have submitted such a "vehicle schedule," which includes the Ford 500 that was registered in Minnesota and assigned to Tomars.  This first declarations page shows a total policy premium of $126,430.95 for insuring all of the fleet vehicles included in the schedule.

        It is therefore manifestly clear that the second declarations page – the one insuring five Ohio vehicles at a premium of $5,072 – is *not* the declarations page for a commercial fleet policy insuring several thousand vehicles nationwide.  Nevertheless, Tomars' counsel contended, in a letter submitted after the motions hearing at which she herself produced and argued from the first declarations page, that the second declarations page corresponds to the fleet policy that covered the Ford 500.

        Despite the Court's best efforts to prod the parties to explain the contents of the various policy documents  they have put before the Court – in fact, despite the Court's direct order that the parties "meet and confer about the discrepancies between the[] sets of documents" they submitted and "provide the Court with a single, complete, and accurate version of the insurance policy that covered" the Ford 500 at the time of the accident, ECF No. 101 – the relevance of this second declarations page to this case remains a mystery.

- a number of endorsements, including an Ohio Uninsured/Underinsured Motorist ("UI/UIM") Coverage Endorsement (Form 2852 OH (09/04)).

*See* Policy, ECF No. 37-1 at 4-59.

As with the Minnesota UI/UIM endorsement, Tomars is an insured under the Ohio UI/UIM endorsement included in this policy. *Id.* at 35-36 (defining "insured" as "any person occupying your insured auto"). However, under the plain terms of the Ohio UI/UIM endorsement, Tomars is not entitled to any UIM benefits.

In contrast to Minnesota's "damages less paid" brand of UIM coverage, Ohio defines UIM as "difference of limits" coverage, meaning that it affords "protection for insureds thereunder for bodily injury, sickness, or disease, including death, suffered by any insured under the policy, where the limits of coverage available for payment to the insured under all bodily injury liability bonds and insurance policies covering persons liable to the insured are less than the limits for the underinsured motorist coverage." Ohio Rev. Code § 3937.18(C). True to this aspect of Ohio insurance law, UIM coverage is available under the Ohio endorsement only where the insured has sustained "damages . . . which [he] is legally entitled to recover from the owner or operator" of "an auto to which a bodily injury liability bond or policy applies at the time of the accident, but its limit of liability for bodily injury . . . is less than the coverage limit for Underinsured Motorist Coverage shown on the Declarations Page . . . ." Policy, ECF No. 37-1 at 34, 36. Because the truck with which Tomars collided was insured to a $1 million limit of liability for bodily injury and the parties agree that the fleet policy's declarations page shows a

$1 million UIM coverage limit,[3] UIM benefits are not available to Tomars under this "difference of limits" coverage.[4]

Understandably, Tomars asserted in his opposition to United's first motion for summary judgment that the Ford 500 was covered by the certified policy with the Minnesota UI/UIM endorsement that United had provided to him in the spring of 2011. In light of that dispute, the Court denied United's motion without prejudice.

Discovery then proceeded until, in early 2014, United filed a second motion for summary judgment. On that motion, United persisted in its position the Ford 500 was covered with only an Ohio UI/UIM endorsement, while Tomars persisted in his position regarding the certified Minnesota UI/UIM endorsement. Just prior to oral argument, Tomars signaled his intention to move to amend his Complaint. United's second motion for summary judgment was subsequently denied without prejudice.

---

[3]     All of the parties' arguments throughout this case – including on these motions – have been premised on the assumption that the United policy insuring the Ford 500 at the time of the accident provides $1 million in UIM coverage. The declarations page for the fleet policy, however, indicates only that it provides $1 million worth of "uninsured motorists" coverage at a premium of $5,487.66; it contains no mention of any *under*insured motorists coverage.

     None of the parties, however, have ever argued that this wording signifies that the fleet policy provides no UIM coverage. In fact, to the contrary, all parties agree here that the fleet policy does provide a $1 million limit of liability for both UI and UIM coverage.

     In any event, the issue is not determinative. Whether the declarations page indicates a $1 million limit of liability for UIM coverage or none at all, the outcome of these motions is the same.

[4]     The Ohio UIM endorsement also contains a "reduction clause," whereby by "[t]he limits of liability under this endorsement shall be reduced by all sums . . . available for payment for bodily injury . . . under liability bonds and policies covering persons liable to the insured." *Accord* Ohio Rev. Code § 3937.18(C) ("The policy limits of the underinsured motorist coverage shall be reduced by those amounts available for payment under all applicable bodily injury liability bonds and insurance policies covering persons liable to the insured.").

     Therefore, the $1.3 million settlement Tomars received from the driver, owner, and insurer of the truck – including the exhaustion of the truck's $1 million bodily injury limit of liability – reduces the $1 million limit of liability for UIM coverage to zero.

Tomars then did amend his Complaint to add the second count, alleging that The Progressive Corporation and Progressive Casualty had intended to insure the Ford 500 with $1 million of Minnesota-style "damages less paid" UIM coverage and should therefore be required to provide it. This claim was evidently pled as a hedge against the possibility that the Ohio UI/UIM endorsement would be found to have been the only one applicable to the vehicle at the time of the accident. The four parties then conducted further discovery.

In February of 2015, the Defendants filed the two motions for summary judgment that are now pending. On these motions, all three of the Defendants continue in the line that United took with its first two motions for summary judgment, arguing that the Ford 500 was insured at the time of Tomars' accident by a commercial fleet policy with a $1 million limit of liability for UIM coverage and only an Ohio UI/UIM endorsement. Tomars, though, diverts from his previous tack and now explicitly adopts the Defendants' position on the matter, stating unequivocally in his opposition to these motions that the policy covering the Ford 500 "contain[ed] only Ohio-based forms and endorsements," including "Ohio's endorsement 2852 OH (09/04)" – the UI/UIM endorsement. Plaintiff's Memorandum in Opposition at 2, 11, ECF No. 93. In addition, Tomars makes no argument of any kind arising from or relating to United's admittedly erroneous certification and disclosure of the policy with Minnesota endorsements in 2011. In fact, Tomars makes no mention of that disclosure at all here.

Tomars offers no explanation for abandoning his prior position. But whatever the reason, it is undisputed on the motions now before the Court that the policy applicable to the Ford 500 at the time of Tomars' accident consists in material part of a commercial auto base form, a declarations page showing a $1 million limit of liability for UIM coverage, and an Ohio UI/UIM endorsement that supplies the terms and conditions of that UIM coverage.

As explained above, there are no UIM benefits available to Tomars under this policy; the "difference of limits" UIM coverage that the Ohio endorsement provides is not triggered by the facts and circumstances of Tomars' accident.[5]   United has therefore not breached the terms of the policy as they are written by denying Tomars' demand for payment of UIM benefits under it.

## II.   Reformation.

Tomars would concede that much.  But he argues, while still agreeing with the Defendants that the fleet policy as written did not actually contain a Minnesota UI/UIM endorsement that would provide "damages less paid" coverage, that it was intended that it would. Consequently, Tomars asserts, the fleet policy should be reformed to include the Minnesota UI/UIM endorsement.  United and Progressive Casualty, the parties who negotiated the policy, disagree.

Neither the fact that Tomars was not involved in the negotiation or construction of the policy, nor that the parties that were both contend that the policy as written accurately reflects

---

[5]   Tomars suggests in his briefing that the policy's UIM coverage is "illusory" and that he is precluded from recovering under it by a "hidden" clause.  Neither characterization is accurate.

Tomars cannot recover UIM benefits under the fleet policy because the circumstances surrounding his accident do not satisfy the requirement, which is set forth clearly and unambiguously in the very definition of the coverage itself, that the tortfeasor's vehicle be insured for bodily injury at an amount less than the UIM coverage limit.  That Tomars does not qualify for UIM benefits on these particular facts does not render the "difference of limits" coverage that the policy provides "functionally nonexistent" or a "delusion."  *See In re SRC Holding Corp.*, 545 F.3d 661, 670-71 (8th Cir. 2008) (discussing Minnesota's illusory-coverage doctrine, which is "best applied . . . where part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent") (quotation omitted).  *Cf. Bethel v. Darwin Select Ins. Co.*, 735 F.3d 1035, 1041 (8th Cir. 2013) (discussing Minnesota's reasonable expectations doctrine, which is "extremely narrow" and limited only to "resolving ambiguity in policy terms and for correcting extreme situations, such as where a party's coverage is significantly different from what the party reasonably believes it has paid for and where the only notice the party has of that difference is an obscure and unexpected provision") (quotations and punctuation omitted).

their intentions with respect to the coverage it provides, precludes Tomars from seeking its reformation here.  It is undisputed that Tomars is an insured under the policy and, as an employee of the corporate named insured and an authorized operator of its insured vehicle, the policy is designed to inure to his benefit.  *See Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d 349, 354-55 (Minn. 2000) (finding that objections to reformation by the parties to the contract are not determinative of the plaintiff's standing to pursue reformation, and noting that an intended third-party beneficiary of an insurance policy has rights under it); *FirstMerit Corp. v. Convenient Food Mart, Inc.*, No. 2001-L-226, 2003 WL 943879, *2 (Ohio Ct. App. March 7, 2003) (unpublished) ("A party seeking reformation of a contract must actually be a party to the contract or an intended third party beneficiary of the contract it seeks to have reformed.") (citing *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 577 (Ohio 1994) ("[O]nly an intended beneficiary may exert rights to a contract of which he is not a party.")).

As for which law governs Tomars' reformation argument, the parties' positions are not entirely clear.  In a different context, they dispute whether the fleet policy should be construed under the law of Minnesota, where the Ford 500 was registered and garaged and where the accident occurred, or of Ohio, where United and Progressive Casualty are headquartered and where the policy was written.

This dispute need only be decided if there is an outcome-determinative difference between Minnesota and Ohio law.  *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012) (explaining that "[i]n determining which state's law applies, we generally employ the forum state's choice-of-law rules" and that the first step of Minnesota's "analysis . . . requires examination of whether the different states' laws actually present a conflict").  With respect to reformation, there is not.  The basic doctrine is the same in both states: an insurance policy that

fails to reflect the shared intention of the contracting parties may be reformed by a court to conform the policy to that shared intention. *See Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d 349, 354 (Minn. 2000) ("The purpose of reformation is not to create a new policy; rather, it is to bring the written instrument into conformity with the intent of the contracting parties.") (citation omitted); *Shear v. W. Am. Ins. Co.*, 464 N.E.2d 545, 547 (Ohio 1984); *Amsbary v. Brumfield*, 894 N.E.2d 71, 75-76 (Ohio Ct. App. 2003) ("The purpose of reformation is not to make a new agreement but to give effect to the one actually made by the parties, which is not accurately reflected in the written agreement.") (citation omitted).

Minnesota and Ohio do differ somewhat with respect to the grounds on which reformation may be granted. In Ohio, reformation is appropriate where the policy fails to integrate the agreement of the parties either because of the mutual mistake of the contracting parties or because of the unilateral mistake of the agent or insurer. *Snedegar v. Midwestern Indem. Co.*, 541 N.E.2d 90, 96-97 (Ohio Ct. App. 1988). In Minnesota, while mutual mistake is also cause for reformation, unilateral mistake may only be if it is accompanied by fraud or inequitable conduct. *Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d at 354.

This difference, however, is of no consequence here. Whether sought on the basis of mutual or unilateral mistake, reformation in both states is premised upon – and cannot be had without – a showing that the parties to the contract at issue reached a "valid agreement" that is not expressed in the contract as written:

> As an initial step, a party seeking reformation . . . must prove the existence of a valid agreement between the parties expressing their real intentions. . . . The intentions shared between the parties must be identical. . . . [A]bove all, there must be evidence that there was an actual agreement as to the terms of the policy.

*Employers Mut. Cas. Co. v. Wendland & Utz, Ltd.*, 351 F.3d 890, 895 (8th Cir. 2003) (applying Minnesota law) (internal quotations and citations omitted). *Accord Faivre v. DEX Corp. Ne.*,

913 N.E.2d 1029, 1036 (Ohio Ct. App. 2009) ("[I]n order to reform a written contract, an underlying agreement between the parties must exist.").  Parol evidence is admissible to make this showing.  *Anchor Cas. Co. v. Bird Island Produce, Inc.*, 82 N.W.2d 48, 55 (Minn. 1957); *Aronovitch v. Levy*, 56 N.W.2d 570, 576 (Minn. 1953); *Wagner v. Nat'l Fire Ins. Co.*, 8 N.E.2d 144, 148 (Ohio 1937).

In this respect, Tomars argues that the fleet policy as written – with only an Ohio UI/UIM endorsement – fails to reflect an agreement that Progressive Casualty and United reached to insure the fleet vehicles to a UIM limit of $1 million in accordance with "the industry standard for large corporations insuring multistate fleets," which, he asserts, is "to obtain a single insurance policy that covers the entire fleet, with that policy including state-specific policy forms for all states in which the fleet has autos licensed, registered, and principally garaged." Plaintiff's Memorandum in Opposition at 19, ECF No. 93.

Tomars' argument is strongly shaded by his position that United *should have* written the fleet policy in accordance with the "industry standard" as he defines it.  That, however, is not the appropriate inquiry here.  The question is whether Progressive Casualty and United actually did, as a matter of fact, agree that that is how the fleet policy would be written.

The record before the Court demonstrates conclusively that they did not.  Viewed in the light most favorable to Tomars, the facts are that the only points Progressive Casualty and United agreed on were the categories of coverage and the limits of liability the fleet policy would contain and the premium that would be charged for it.  Even as Tomars himself tells it, the parties to the policy never discussed, much less agreed upon, the manner in which the coverages would be written.  What's more, Tomars has produced no evidence that United even understood there to be an "industry standard" for multistate fleet policies – even if it was mistaken as to what

16

that standard entailed – which is logically a prerequisite to agreeing to write a policy in conformity with it.  In fact, Tomars highlights the evidence that this policy was the only one that United had ever written "that provides coverage for a fleet in which the insured vehicles are principally garaged in states other than the state in which the named insured resides."  Plaintiff's Memorandum in Opposition at 8, ECF No. 93.

Evidence of Progressive Casualty's approach to insuring its fleet can be found in the deposition testimony of Sara Stahlik, the Progressive Defendants' Business Leader of Risk and Treasury Management.  According to Stahlik, the Progressive Defendants endeavored to insure the fleet in a way that would be "compliant with [the] leasing agreements" and "the minimum requirements [set] by the states," while also being "fair and equitable" and comparable to "what other corporations [with multistate fleets] are providing."  Stahlik further testified that, in light of those considerations, the Progressive Defendants determined that insuring the fleet to a $1 million limit of liability with a $1 million deductible in several coverage areas – including UI/UIM – would be appropriate to "protect[] both the vehicles, the employees, and the assets of the company."  Stahlik went on to state that "the purpose of [selecting] the liability limit of a million dollars on each of [the] lines of coverage" was also to cap "the total exposure for the aggregate coverages [at] a million dollars."

According to Tomars' own recitation of the facts, United played no part in the Progressive Defendants' deliberations regarding the categories of coverage and limits of liability they desired, and there is no evidence that the Progressive Defendants ever consulted with United regarding the thought process or goals that brought them to those conclusions.  As Tomars explains in his memorandum, "the Progressive defendants first determined that they wanted $1 million liability limits on each of the line item coverage grants. . . . The selection of

the insurer and the premium determination were made only after the decision to purchase $1

million limits on each coverage grant was made."  Plaintiff's Memorandum in Opposition at 9,

ECF No. 93.

That is consistent with the evidence.  In regard to the Progressive Defendants' decision to

insure the fleet through United, Stahlik testified as follows:

> Q: Do you select these limits, the line item limits, on – do you make a decision
>     about what those limits, you want them to be and then go looking for –
> A: Coverage.
> Q: - coverage?
> A: Yes.
> . . .
> Q: Okay.  So when you make a determination, if I'm understanding you
>     correctly, you're making a decision that you want to purchase limits of a
>     certain amount for certain lines of coverage, correct?
> A: That's correct.  And that's customary in just about any policy we buy.
> Q: Okay.
> A: We determine the limits.
> Q: So you make that determination, that would be first?
> A: Correct.
> Q: Okay.  And then – and then you make the determination to get that
>     coverage and find out how much the premium would be, correct?
> A: Yes, that would be second.
> . . .
> Q: But you go in having determined what the levels of coverage you wish to
>     purchase are?
> A: Yeah, otherwise they don't know how to price it, right?

Tomars himself succinctly describes the process by which the fleet policy was negotiated

and constructed as follows:

> The Progressive defendants, operating through . . . Sara Stahlik, . . . made the
> decision to purchase a policy with specified coverage grants at the specified
> $[1 m]illion liability limits for each grant, with a $1 [m]illion deductible for
> the policy year 2009-2010. . . . The corporate actuarial department determined
> the aggregate premium that is to be charged for the [United] policy. . . .
> [United] issued a policy with the requested lines of coverage, coverage-grant-
> liability limits, and deductibles. . . . The Progressive defendants did not review
> or consider the language contained in the policy.  *The policy forms [United]*
> *was going to use were not discussed, negotiated, or considered.*  When
> presented with the aggregate premium, Progressive simply paid it.

18

Plaintiff's Memorandum in Opposition at 10-11, ECF No. 93 (emphasis added).

Tomars' argument for reformation depends upon a showing that the Progressive Defendants and United reached an agreement to insure the fleet with a policy that would be written in conformity with the "industry standard." But Tomars points to no evidence that the Progressive Defendants and United shared any such intention. Even by his own version of the facts, there was no agreement at all between the Progressive Defendants and United regarding the manner in which the coverages requested by the Progressive Defendants would be written.

There is therefore no basis on which to reform the fleet policy to provide $1 million of "damages less paid" coverage through the addition of a Minnesota UI/UIM endorsement.

## III.    Implied by law.

In the absence of an agreement to insure the fleet with a series of state-specific UI/UIM endorsements, the fleet policy was written, of course, with only an Ohio UI/UIM endorsement. While that endorsement provides $1 million worth of "difference of limits" UIM coverage, it left the Ford 500 without any "damages less paid" UIM coverage.

As an alternative to the reformation argument discussed above, Tomars contends that the "difference of limits" definition of UIM coverage that appears in the Ohio endorsement should be overlaid with a "damages less paid" definition because Minnesota's No-Fault Act required the Defendants – regardless of their intent with respect to the fleet policy – to have insured the Ford 500 with "damages less paid" UIM coverage. *See Siebels v. Am. Family Mut. Ins. Co.*, 374 N.W.2d 220, 222 (Minn. Ct. App. 1985) ("[R]eformation to provide statutorily mandated . . . underinsured coverage due to a failure of a statutory obligation is not the same as reformation

due to mistake or fraud.  In the former, the parties are not put back to the position they would have been in originally in the strict sense as is done in the latter.").

Tomars' approach to this issue would effectively convert the fleet policy's $1 million worth of "difference of limits" coverage into $1 million of "damages less paid" coverage. United opposes that proposal, arguing that Minnesota law provides no grounds for reading "damages less paid" coverage into the fleet policy where it does not exist.  For its part, Progressive Casualty concedes that, because the Ford 500 was not properly insured in accordance with Minnesota's UIM provisions, it may be held responsible for providing "damages less paid" UIM coverage to Tomars, but only to the minimum levels set by Minnesota law.

The Defendants' positions are both persuasive.  The premise of Tomars' argument is correct, but only insofar as Minnesota law did in a general sense require that the Ford 500 be insured with "damages less paid" UIM coverage.  The details of that requirement, however, are crucial, and they dictate the outcome here.

There is no dispute that the Ford 500 was registered and principally garaged in Minnesota at all relevant times.  Minnesota's No-fault Act provides at Minn. Stat. § 65B.49, subd. 3a(1) that

> [n]o plan of reparation security may be renewed, delivered or issued for delivery, or executed in this state with respect to any motor vehicle registered or principally garaged in this state unless separate uninsured and underinsured motorist coverages are provided therein.  Each coverage, at a minimum, must provide limits of $25,000 because of injury to or the death of one person in any accident and $50,000 because of injury to or the death of two or more persons in any accident. In the case of injury to, or the death of, two or more persons in any accident, the amount available to any one person must not exceed the coverage limit provided for injury to, or the death of, one person in any accident.

And, at subsection 3a(2), the statute requires "[e]very owner of a motor vehicle registered or principally garaged in this state [to] maintain uninsured and underinsured motorist coverages as provided in this subdivision."

Minnesota courts have held that, with respect to UIM coverage, these two subsections of the No-Fault Act impose separate and distinct obligations on the owner and insurer of a vehicle registered or principally garaged in Minnesota. *Laurich v. Emcasco Ins. Co.*, 455 N.W.2d 527, 528-29 (Minn. Ct. App. 1990). Under subdivision 3a(2) of Minn. Stat. § 65B.49, the owner, regardless of where it itself is located, is required to purchase at least the specified minimum $25,00/$50,000 levels of UIM coverage for its Minnesota vehicle.[6] *Id.* But, under subdivision 3a(1), an insurer that writes a policy for a vehicle registered or principally garaged in Minnesota is obligated to include at least those minimum levels of UIM coverage only where the policy is "renewed, delivered or issued for delivery, or executed" in Minnesota.[7] *Id.*

While Tomars acknowledges that the fleet policy was written and executed in Ohio by one Ohio corporation (United) for another (either Progressive Casualty, or the Progressive Defendants jointly), he argues that it was either "delivered" or "issued for delivery" in Minnesota because "an insurance identification card for the [Ford 500] was delivered directly to [him]

---

[6]     The statute contains no exception to this rule for an owner who chooses to insure its Minnesota vehicle with a fleet policy that also covers other vehicles in other states. *Cf. Latterell v. Progressive N. Ins. Co.*, 801 N.W.2d 917, 923 (Minn. 2011) (explaining that "UIM coverage, unlike some other types of first-party coverage, follows the vehicle rather than the insured on the policy") (citation omitted).

[7]     Minn. Stat. § 65B.50, subd. 1, which requires "[e]very insurer licensed to write motor vehicle accident reparation and  liability insurance in [Minnesota to] file with the commissioner and thereafter maintain a written certification that it will afford at least the minimum security provided by section 65B.49 to all policyholders," is not to the contrary. *Schossow v. First Nat. Ins. Co. of Am.*, 730 N.W.2d 556, 559 (Minn. Ct. App. 2007) (explaining that "the 'security' required for all insurance policies covering nonresidents includes only basic-economic loss and residual-liability coverages," such that "[i]f nonresidents purchase underinsured motorist coverage, it does not need to comply with Minnesota law") (citations omitted).

through the mail at his business address at Progressive's Roseville, Minnesota office."
Plaintiff's Memorandum in Opposition at 14, ECF No. 93.  Tomars asserts – conspicuously
without citation to the record – that United "made arrangements for the issuance and delivery of
[this] Minnesota Insurance Identification Card to" him in Minnesota.  Plaintiff's Memorandum
in Opposition at 19, ECF No. 93.

There is no evidence to support this.  The fleet policy itself states on its declarations page
that it was issued for "THE PROGRESSIVE CORP ET AL" (sic) at an address in Mayfield
Village, Ohio.  And the "insurance identification card" on which Tomars relies indicates clearly
on its face that the "Agency/Company" that "Issu[ed the] Card" and mailed it to him is
"Automotive Rentals Inc" ("ARI") of Mount Laurel, New Jersey – the lessor of the Ford 500 –
*not* United or either of the Progressive Defendants.  Tomars has provided the Court with no
evidence of any connection at all between ARI and United.

On what limited evidence there is, it would perhaps be reasonable to infer from the
identification card that the fleet policy covering the Ford 500 was at some point "delivered" to
ARI in New Jersey, whether by United or one or the other of the Progressive Defendants.
However, it does not follow, and Tomars cites no authority that would support the proposition,
that the fleet policy may be deemed to have been "delivered" or "issued for delivery" in
Minnesota because a card evincing its existence was mailed into the state by an entity that is not
a party to that policy.  Tomars does cite *Sawyer v. Midland Ins. Co*., where the Minnesota Court
of Appeals determined that a policy insuring a fleet of 2,500 vehicles that "was issued in New
York and delivered to [the corporate named insured] in Illinois" should also be considered to
have been "delivered" or "issued for delivery" in Minnesota because the insurer sent a certificate
of insurance to a lessee of one of the insured vehicles in Minneapolis.  383 N.W.2d 691, 694

(Minn. Ct. App. 1986).  However, in reaching that conclusion, the *Sawyer* court emphasized that the policy at issue there contained an endorsement that "required [the insurer] to '*issue* . . . a certificate of Insurance under the policy to each lessee of an owned automobile.'"  *Id.*  Tomars points to no similar provision of the fleet policy United wrote, and he offers no evidence that United ever sent anything – not the policy itself, nor a certificate of insurance, nor even an insurance identification card – to anyone in Minnesota.

In short, Tomars has produced no evidence on which it could be found that the fleet policy was "renewed, delivered or issued for delivery, or executed" in Minnesota.  As a result, the requirement in Minn. Stat. § 65B.49, subd. 3a(1) that a policy "renewed, delivered or issued for delivery, or executed" in Minnesota must include at least the minimum $25,000/$50,000 levels of "damages less paid" UIM coverage does not apply to the policy United wrote for Progressive Casualty's fleet.

The fleet policy therefore need not have included any UIM coverage at all.  *See Schossow*, 730 N.W.2d at 562 ("Unquestionably, a policy specifically incorporating Minnesota underinsured coverage is required only when issued in this state.").  And Minn. Stat. § 65B.50, subd. 1 is not to the contrary.  That provision of the No-Fault Act requires

> [e]very insurer licensed to write motor vehicle accident reparation and liability insurance in [Minnesota to] file with the commissioner and thereafter maintain a written certification that it will afford at least the minimum security provided by section 65B.49 to all policyholders, except that in the case of nonresident policy holders it need only certify that security is provided with respect to accidents occurring in this state.

United argues that the fleet policy was issued to a nonresident policyholder – namely Progressive, an Ohio corporation – which Tomars does not dispute.  And as the Minnesota Court of Appeals has explained, "the 'security' required for all insurance policies covering nonresidents includes only basic-economic loss and residual-liability coverages," such that "[i]f

nonresidents purchase underinsured motorist coverage, it does not need to comply with Minnesota law." *Schossow v. First Nat. Ins. Co. of Am.*, 730 N.W.2d 556, 559 (Minn. Ct. App. 2007) (citations omitted).

In analogous circumstances, the Minnesota Court of Appeals has concluded that the No-Fault Act's adoption of a "damages less paid" definition for the UIM coverage it requires cannot justify altering the definition of UIM coverage it does not require:

> [Minnesota's] legislative interest in *how* UIM coverage applies has always followed its interest in *whether* UIM coverage applies. This historic legislative relationship between the operative provisions strongly suggests that subdivision 4a [defining UIM as "damages less paid" or "add-on" coverage in Minnesota] is not intended as a statute of general application to policies that do not require any UIM coverage under subdivision 3a. Neither the legislature nor the courts have ever expressed any policy favoring expanding UIM coverage beyond the parties' agreed-upon terms except for those insurance policies that must, as a matter of law, include UIM coverage.
>
> There is a clear and logical legislative relationship between the requirement that some policies include UIM coverage and the requirement that this mandatory coverage be calculated using a specified standard method. This demonstrates that the legislature did not intend for us to reform UIM provisions beyond those cases where UIM coverage is mandatory. And we discern no legislatively directed interest in imposing a standard to calculate coverage on insurance policies that are not required to include any UIM coverage.

*Johnson v. Cummiskey*, 765 N.W.2d 652, 659 (Minn. Ct. App. 2009). Minnesota law therefore did not require United to include any UIM coverage in the fleet policy, and in Minnesota, "[a]nything in addition to the statutorily-mandated coverages, such as UIM coverage, is a matter of contract between the parties." *Id.* at 660 (quoting *Aguilar v. Texas Farmers Insurance Company*, 504 N.W.2d 791, 794 (Minn. Ct. App. 1993)).

Nonetheless, the fact that the No-Fault Act did not require this particular policy to contain UIM coverage does not relieve Progressive Casualty, as the "owner" of the Minnesota-registered and -garaged Ford 500, of its obligation under Minn. Stat. § 65B.49, subd. 3a(2) to

insure that vehicle to the minimum $25,000/$50,000 levels of "damages less paid" UIM coverage. The consequence of an owner's failure to fulfill that statutory obligation is, as Minnesota courts have recognized, that the owner must provide the minimum limits of "damages less paid" UIM coverage specified in Minn. Stat. § 65B.49, subd. 3a(1). *See Laurich*, 455 N.W.2d at 528 (affirming district court decision requiring corporate "owner" of vehicle that was principally garaged in Minnesota to provide UIM "coverage in the amount of $25,000 per person/$50,000 per accident, the minimum required by the No-Fault Act"); *Schoer v. W. Bend Mut. Ins. Co.*, 473 N.W.2d 73, 77 (Minn. Ct. App. 1991) ("When a court imposes insurance coverage on parties by law rather than by contract, the only coverage imposed is the statutory minimum.") (citation omitted). The Court so concludes here.

## Conclusion

For the reasons discussed above, the requests by United and The Progressive Corporation to be dismissed from this action are granted, and Progressive Casualty is liable to Tomars for up to the minimum limits of "damages less paid" UIM coverage specified in Minn. Stat. § 65B.49, subd. 3a(1).

Though Tomars has thus failed to substantiate his claims for $1 million of "damages less paid" UIM benefits, this ruling does constitute a finding in Tomars' favor on the liability portion of his claim against Progressive Casualty. Tomars, though, has not moved for summary judgment, and the deadline for doing so set by the Scheduling Order has passed. Nonetheless, the question of whether Progressive Casualty is properly held liable to Tomars for the minimum levels of UIM coverage specified in the No-Fault Act rather than the $1 million Tomars sought in his Amended Complaint was squarely put in issue by the Progressive Defendants' motion for

summary judgment.  Tomars has been fully heard on that question, and there are no disputes of material fact to be tried to a jury.  In the circumstances of this now nearly three-year old case, the Court perceives no reason to decline to answer the question here.  *See, e.g., Interco Inc. v. Nat'l Sur. Corp.*, 900 F.2d 1264, 1269 (8th Cir. 1990) (explaining that "[t]he granting of summary judgment [to a non-movant] is consistent with the expeditious disposition of cases, a primary objective of Rule 56," and finding it to be appropriate where "the district court did not posit an issue and proceed to determine it, but rather properly concluded that no genuine issue of material fact existed").

Finally, because the parties have addressed only liability on these motions and not damages, the precise amount of Tomars' recovery remains to be determined.  Therefore, Tomars and Progressive Casualty are directed to meet and confer regarding Tomars' recovery in light of the rulings contained this order.  Those parties shall then inform the Court, within three weeks of the date of this order, as to whether further proceedings on damages will be necessary.

Based on the files, records, and proceedings herein, and for the reasons discussed above, IT IS ORDERED THAT:

1.  Defendant United Financial Casualty Company's Motion for Summary Judgment [ECF No. 86] is GRANTED consistent with the memorandum above.

2.  The Motion for Summary Judgment brought jointly by Defendant The Progressive Corporation and Defendant Progressive Casualty Insurance Company [ECF No. 81] is GRANTED IN PART and DENIED IN PART consistent with the memorandum above.

3.  Defendant United Financial Casualty Company and Defendant The Progressive Corporation are DISMISSED from this action.

4. Partial summary judgment on liability is GRANTED to Plaintiff Michael Anthony Tomars on his claim against Progressive Casualty Insurance Company consistent with the memorandum above.

5. Plaintiff Michael Anthony Tomars and Defendant Progressive Casualty Insurance Company shall meet and confer regarding the amount of Tomars' recovery in light of this order.  Those parties shall then inform the Court, in a joint letter to be filed within three weeks of the issuance of this order, as to whether further proceedings will be necessary in this action.

Dated: June 17, 2015                                   s/Joan N. Ericksen
                                                                JOAN N. ERICKSEN
                                                                United States District Judge